1
2
3
4
5
6
7

8           **UNITED STATES DISTRICT COURT**

9           **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  MONTE Y. SHAW, | )  Case No.: 1:10-cv-02350 - JLT |
| 12           Plaintiff, | )  ORDER DENYING PLAINTIFF'S MOTION FOR |
| 13       v. | )  SUMMARY JUDGMENT |
| 14  MICHAEL J. ASTRUE, | )  (Doc. 21) |
| 15  Commissioner of Social Security, | )  ORDER DIRECTING ENTRY OF JUDGMENT IN |
| 16           Defendant. | )  FAVOR OF DEFENDANT MICHAEL J. ASTRUE, |
| 17 | )  COMMISSIONER OF SOCIAL SECURITY, AND |
| | )  AGAINST PLAINTIFF MONTE Y. SHAW |

18       Monte Shaw ("Plaintiff") asserts he is entitled to benefits under the Social Security Act, and

19  seeks judicial review of the decision denying his applications.  Plaintiff argues the administrative law

20  judge ("ALJ") erred in evaluating the medical evidence and hearing testimony, and in assessing his

21  residual functional capacity.  For the reasons set forth below, the administrative decision is affirmed,

22  and Plaintiff's motion for summary judgment (Doc. 21) is **DENIED**.

23                              **PROCEDURAL HISTORY**[1]

24       Plaintiff filed an application for disability insurance benefits (DIB) on June 22, 2001, alleging

25  disability beginning July 23, 2000.  AR at 109-11.  The Social Security Administration denied his

26  claim at the initial level on November 15, 2001.  *Id.* at 35.  Plaintiff filed a second application for DIB

27  on May 24, 2002, which was denied at the initial level and upon reconsideration.  *Id.* at 35, 113-15.

28

---

[1] Citations to the Administrative Record will be designated as "AR," followed by the appropriate page number.

After requesting a hearing, Plaintiff testified before an ALJ on June 9, 2004.  AR at 476.  The ALJ noted Plaintiff "filed his new application within the one-year period following the date of the notice of the initial determination made with respect to the prior application."  *Id.* at 35.  Therefore, the ALJ re-opened the first application for adjudication.  *Id.* (citing 20 C.F.R. § 404.987). The ALJ determined Plaintiff was not disabled and issued an order denying benefits on July 9, 2004.  *Id.* at 35-42.  Plaintiff requested the Appeals Council review the ALJ's decision.

While the action was pending before the Appeals Council, Plaintiff filed third application for DBI, as well as an application for supplemental security income (SSI) on September 20, 2004.  AR at 124- 26, 446-48.  The applications were denied at the initial level on November 18, 2004.  *Id.* at 449-50.  Plaintiff filed a second application for SSI and fourth application for DIB on February 9, 2005, alleging disability beginning October 15, 2000.  *Id.* at 130-32, 456-59.  These applications were denied on April 14, 2005.  *Id.* at 461.

On November 9, 2005, the Appeals Council vacated the ALJ's decision and remanded the action for further proceedings after finding Plaintiff submitted new and material evidence with his request for review.  *Id.* at 43-45.  The ALJ consolidated Plaintiff's applications for DBI and SSI, and held a second hearing on June 8, 2006.  *Id.* at 17, 497.  The ALJ found Plaintiff was not disabled from July 23, 2000 through the date of the decision issued on July 28, 2006.  *Id.* at 15-23.  Plaintiff's request for review by the Appeals Council was denied on October 6, 2006.  *Id.* at 8-10.

Plaintiff initiated an action for judicial review in the United States District Court for the District of Alaska, Case No. 4:06-cv-00037-RRB.  Plaintiff and the Commissioner of Social Security ("Commissioner") stipulated that the action be remanded and assigned to a new ALJ for further administrative proceedings.  AR at 591-92.  Accordingly, the District Court remanded the action pursuant to sentence four of 42 U.S.C § 405(g), with instructions for a new ALJ to evaluate Plaintiff's subjective complaints, mental impairments, and the opinion evidence on June 26, 2007.  *Id.* at 593.

On November 14, 2007, Plaintiff testified for the third time before an ALJ.  AR at 627.  The ALJ noted Plaintiff was alleging disability since July 8, 2004, and concluded he was not disabled through his date last insured of December 31, 2005.  *Id.* at 579, 589.  The Appeals Council found no reason to assume jurisdiction over the decision on June 27, 2008.  *Id.* at 568-70.

Again, Plaintiff requested judicial review of the action by the District Court in *Shaw v. Astrue*, Case No. 4:08-cv-00028-RRB.  On September 25, 2008, the parties stipulated to a remand of the action, noting Plaintiff had alleged different onset dates in his applications for DBI and SSI benefits. *Id.* at 683-84.  Accordingly, the District Court remanded the matter pursuant to sentence four of 42 U.S.C. § 405(g), instructing the ALJ to (1) develop the record to clarify the exact date of disability onset alleged by Plaintiff and (2) give further consideration to the cumulative case record for the entire period at issue. *Id.* at 681-82.  The Appeals Council vacated the final decision of the Commissioner and remanded the action for further proceedings by an ALJ consistent with the District Court's order. *Id.* at 679-80.

On March 15, 2010, Plaintiff testified for the fourth time before an ALJ.  AR at 719.   At the hearing, Plaintiff "amended the allege[d] onset date of disability to October 15, 2000." *Id.* at 663. The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on August 24, 2010. *Id.* at 663-76.  Plaintiff did not file written exceptions to the decision.  Therefore, the ALJ's determination became the final decision of the Commissioner on October 25, 2010.

Plaintiff initiated the action before this Court on December 24, 2010, seeking judicial review of the ALJ's decision.  (Doc. 1).  Because the Appeals Council could not locate the record, the parties stipulated to a remand pursuant to sentence six of 42 U.S.C. § 405(g).  (Docs. 11-12).  After the parties informed the Court the administrative record had been located and prepared, the matter was re-opened by the Court on October 4, 2011.  (Doc. 13).

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

3

1    Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

2    reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

3    389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

4    must be considered, because "[t]he court must consider both evidence that supports and evidence that

5    detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

6                                    **DISABILITY BENEFITS**

7        To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to

8    engage in substantial gainful activity due to a medically determinable physical or mental impairment

9    that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

10   § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

11       his physical or mental impairment or impairments are of such severity that he is not
         only unable to do his previous work, but cannot, considering his age, education, and
12       work experience, engage in any other kind of substantial gainful work which exists in
         the national economy, regardless of whether such work exists in the immediate area in
13       which he lives, or whether a specific job vacancy exists for him, or whether he would
         be hired if he applied for work.
14

15   42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

16   *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  When a claimant establishes a prima facie case of

17   disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other

18   substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

19                              **ADMINISTRATIVE DETERMINATION**

20       To achieve uniform decisions, the Commissioner established a sequential five-step process for

21   evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920 (a)-(f).  The process

22   requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the

23   period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled

24   one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether

25   Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to

26   perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must

27   consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927, 416.929.

28   ///

                                            4

**A.     Relevant Medical Evidence**

On July 24, 2000, Plaintiff was treated at Fairbanks Urgent Care for low back pain.  AR at 363.  He informed Dr. Larry Harikian he injured his back while working.  *Id*.  He claimed the pain lasted for several days but Plaintiff returned to work until suffering a second episode "which lasted for approximately one week."  *Id*. at 283.

On September 5, 2000, Dr. Harikian noted Plaintiff no longer had leg pain, although he reported "some soreness" in his low back.  AR at 302.  According to Dr. Harikian, Plaintiff was "much improved" without spasms in his back or spinal tenderness, and he had a full range of motion.  *Id*.  Therefore, he believed Plaintiff was able to work with limitations, including "no bending/lifting" and "no shoveling."  *Id*.  Dr. Leonie DeRamus, who also treated Plaintiff at Fairbanks Urgent Care, found Plaintiff's lumbar sprain was "resolving."  *Id*.  On September 25, 2000, Dr. Harikian recommended Plaintiff continue light duty for five days, and then return to work without limitations.  *Id*. at 299.

Plaintiff reported he had a third injury at work on October 6, 2000, when he "slipped and fell and twisted on the ice at work."  AR at 283.  On October 9, Dr. DeRamus opined Plaintiff was able to return to work, but should be limited to a "desk job."  *Id*.at 358

Plaintiff underwent an MRI examination of his lumbar spine on October 19, 2000.  *Id*. at 305.  Dr. Mark Burton found Plaintiff had desiccation at several levels, degenerative changes and a "small focal disc herniation present" at the L1-2 level, "a broad mild disc bulge" at the L4-5 level, and "a focal central disc herniation" at the L5-S1 level.  *Id*.  Based upon the MRI results, Dr. Rieck concluded Plaintiff had mild degenerative disc disease.  *Id*. at 306.

Upon referral from Dr. Harikian, Dr. Roy Pierson performed an orthopedic evaluation on November 9, 2000.  *Id*. at 282-84.  Dr. Pierson observed Plaintiff "demonstrate[d] antalgic behavior with all of his movements during his interview and evaluation."  *Id*. at 283.  Dr. Pierson determined Plaintiff had "an L5-S1 herniated disc," which he treated with an epidural cortisone injection.  *Id*. at 282.  At a follow-up appointment on December 13, 2000, Plaintiff reported "moderate improvement" and "no lower extremity pain."  *Id*. at 281.  He said the pain was "localized to the buttocks and posterior low back."  *Id*.  Dr. Pierson observed Plaintiff "continue[d] to have an antalgic gait," although he did not use a cane or crutch.  *Id*.  Plaintiff declined a second epidural injection.  *Id*.

On January 18, 2001, Plaintiff reported "he had several days of improvement of his symptoms, but that [the injection] wore off and he returned to his pre-injection level of symptoms." AR at 280. In addition, Plaintiff "wishe[d] to consider returning to work in a light duty capacity." *Id.* Dr. Pierson observed Plaintiff favored his lower back, but "move[d] easily about the office." *Id.* He determined Plaintiff "should not return to heavy work activity." *Id.* However, on April 24, 2001, Dr. Pierson noted Plaintiff had not returned to work "because no light duty laborer work is available." *Id.* at 279.

Dr. John Joosse conducted an independent medical evaluation on June 18, 2001, and reviewed Plaintiff's MRI from October 2000. AR at 271. Plaintiff reported he was "able to be horizontal with no pain, but [could] sit only two hours, and . . . stand one to two hours before he has to change position and move about." *Id.* Dr. Joosse noted Plaintiff was able to heel-walk, toe walk, and do a full squat. *Id.* Dr. Joosse opined:

> Based upon the MRI appearance and the patient's continued symptomatic painful low back, I would advise him to seek light duty, sedentary-type employment rather than continue heavy lifting and laboring.
>
> Because of the risk of aggravating the existing degenerative discs, Mr. Shaw should avoid bending and twisting his spine and lifting more than 25 to 30 pounds at a time.

*Id.* at 272. Dr. Joosse noted: "I believe these limitations are permanent, although typically patients with degenerative disc disease have good days and bad days, and [Plaintiff] may feel much less pain in the future." *Id.* Dr. Joosse opined surgery "may relieve a good portion of Mr. Shaw's discomfort," but Plaintiff said he was "not interested in surgery" and "declined any further treatment." *Id.* at 273.

Dr. Pierson noted he concurred with the assessment of Dr. Joosse on July 24, 2001. AR at 278. Plaintiff stated "his symptoms . . . dramatically improved" and he had "minimal low back symptoms." *Id.* Dr. Pierson observed Plaintiff moved "easily" about the office. *Id.* Therefore, he recommended Plaintiff begin vocational rehabilitation immediately. *Id.*

On June 27, 2002, Dr. DeRamus explained he could not evaluate Plaintiff's ability to work because he had not been treated at Fairbanks Urgent Care since 2000. AR at 294.

Dr. Loren Jensen reviewed Plaintiff's records and performed an orthopedic consultation on August 7, 2002. AR at 307-10. Plaintiff reported pain in his lower back, which "worsened with sitting and standing for prolonged periods of time." *Id.* at 308. He described "pain shooting

6

anteriorally in the side, down as far as the knees," as well as "some knee pain . . ., which is present if he arises from a sitting position after a prolonged period of inactivity." *Id.* Upon examination, Dr. Jensen found Plaintiff's muscle strength was "5/5 for all specific muscle groups," and he had "a full range of motion at the hips and knees." *Id.* at 309. Plaintiff had "tenderness over the entire lumbar spine, principally in the midline and to a lesser extent over the paralumbar musculature with some mild tenderness over the sacroiliac joints themselves." *Id.* Plaintiff complained of pain when he bent over and touched his knees. *Id.* Dr. Jensen determined Plaintiff was "capable of lifting and carrying 25 pounds," as well as "handling, speaking, seeing, and traveling without restrictions." *Id.* at 310. Therefore, Dr. Jensen concluded Plaintiff was "capable of working on light to moderate levels of work without restrictions, other than being allowed to change positions frequently." *Id.*

On September 9, 2002, Dr. William Backlund reviewed the functional capacity assessment of a single decision maker ("SDM"), and agreed with the assessment that Plaintiff was able to lift and carry 10 pounds frequently and 20 pounds occasionally, and sit, stand or walk about six hours in an eight-hour day. AR at 312, 320. He opined Plaintiff was able to frequently kneel; crouch; crawl; and climb ramps, stairs, ladders, ropes, and scaffolds. *Id.* at 313, 320. According to Dr. Backlund, "[b]alancing should not be a problem" for Plaintiff, but he should be limited to occasional stooping. *Id.* at 320. Further, he found Plaintiff should avoid concentrated exposure to vibrations. *Id.* at 315, 320.

Dr. David Witham performed a physical examination of Plaintiff at Tanana Valley Medical-Surgical Group Clinic ("Tanana Valley Clinic") on October 2, 2003. AR at 337. Dr. Witham observed Plaintiff exhibited "considerable pain behavior with grimacing on all lumbar range of motion testing." *Id.* Dr. Witham ordered another MRI of Plaintiff's lumbar spine, and determined Plaintiff "continue[d] to exhibit degenerative disc changes at 4, 5 and a central and primarily right-sided disc herniation at L5, S1." *Id.* at 334. Dr. Witham compared the results to the prior MRI and concluded: "No major changes in appearance of lumbar MRI has occurred in the interim since the year 2000." *Id.* Therefore, he recommended conservative treatment be continued. *Id.*

Dr. Clay Triplehorn, another physician at Tanana Valley Clinic, began treating Plaintiff on December 17, 2003. AR at 380. Plaintiff wanted to establish care for his "chronic pain," which he described as "4-5/10 in intensity." *Id.* at 406-07. Dr. Triplehorn observed that Plaintiff walked "with

7

a slightly broad based guarded gait due to apparent low back discomfort." *Id.* at 405.  In addition, Plaintiff sat and rose "with apparently difficulty due to low back stiffness." *Id.*  According to Dr. Triplehorn, Plaintiff had a "loss of the lumbar curve" caused by "moderate" vertebral muscle spasm. *Id.*  Plaintiff did not have any spinal tenderness.  *Id.*

In January 2004, Dr. Triplehorn noted Plaintiff reported his medication was "helpful" and would "take the edge off."   AR at 398.  Plaintiff stated his pain was "4-7/10 depending on his level [o]f activity." *Id.*  Plaintiff reported he had "difficulty standing for greater than 5 minutes or walking … [and] sitting for any prolonged period of time. *Id.* at 402.  Plaintiff requested that Dr. Triplehorn sign a disability form, but Dr. Triplehorn opined he was "not feeling at all qualified to document that [Plaintiff was] significantly disabled at the present time . . . and certainly not for long-term permanent disability." *Id.* at 400-02.  Dr. Triplehorn noted he told Plaintiff that he "[did] not provide long-term disability ratings." *Id.* at 400.

In March 2004, Plaintiff reported his pain was a "3-6 out of 10 in severity," although he was no longer taking pain medication.  AR at 392.  Dr. Triplehorn observed Plaintiff was "quite angry" about his inability to get a pension and the fact that "no one will sign that he is 100% disabled from his back injury." *Id.*  He noted:

> As discussed in previous visits, [Plaintiff] stated that he could go to California and see a physician who would sign his form and he would then take on a class action lawsuit against all of the physicians he has seen in town.  He then went on to mention that there were also physicians in town that for 5,000 dollars would sign his disability form.

*Id.* at 392.  Dr. Triplehorn observed Plaintiff's "straight leg raising was unremarkable." *Id.* at 391. Again, he informed Plaintiff that he would not be willing to sign the form that indicated Plaintiff was "unable to perform any job." *Id.* at 391.

On August 9, 2004, Plaintiff estimated he was able to stand for thirty minutes or walk one block before "experiencing severe discomfort." AR at 377.  Plaintiff told Dr. Triplehorn that his symptoms improved with lying down, and his pain increased to "8-9/10 in intensity" with increased activity. *Id.*  Dr. Triplehorn noted Plaintiff's pain was "fairly well controlled" with medication. *Id.* at 378.  Again, Plaintiff requested Dr. Triplehorn complete a disability form. *Id.* at 380-83.

Dr. Triplehorn[2] noted Plaintiff had the ability to sit up to four hours in an eight-hour day, stand up to 30 minutes continuously and two hours total in an eight-hour day, and walk up to fifteen minutes continuously and two hours total in an eight-hour day. *Id.* at 381. In addition, Dr. Triplehorn indicated Plaintiff would need to have extended breaks to relieve his low back pain. *Id.* He found Plaintiff was unable to use his hands for any repetitive actions including simple grasping, pushing or pulling arm controls, and fine manipulation. *Id.* at 382. Dr. Triplehorn opined Plaintiff was able to lift 20-25 pounds and carry up to 20 pounds occasionally. *Id.*

In January 2005, Plaintiff sought treatment at Fairbanks Community Mental Health Center after he was banned from Tanana Valley Clinic for making statements "about wanting to shoot Dr. Triplehorn for not signing his pension release form." AR at 408, 410. Mary Nevin-Hass, R.N., noted:

> [Plaintiff] felt his angry was intensifying and contributing to his depression and he "needed help before I could hurt somebody. I made some comments to my therapist. Now I've been banned from that doctor's office. I would never shoot the man. I don't even own a gun." ". . . I've learned now you can't say those types of things." [Plaintiff] reports that when his angry becomes intense, he "says mean things that [he] really shouldn't say."

*Id.* at 408. On February 3, 2005, Ms. Nevin-Hass found Plaintiff's thought process was "logical and well-connected." AR at 412. She determined Plaintiff's thought content was "free of grandiose or paranoid delusions, ideas of reference, auditory or visual hallucination or obsessive-compulsive phenomena." *Id.* According to Ms. Nevin-Hass, Plaintiff "appear[ed] to be suffering from a Major Depressive Disorder which is recurrent in nature with accompanying passive suicidal ideation." *Id.* She gave Plaintiff a GAF score of 40, and diagnosed Cymbalta for his symptoms.[3] *Id.* at 413.

Dr. Mikki Barker completed a pension questionnaire on March 16, 2005. AR at 416-21. She opined Plaintiff suffered from a major depressive disorder and pain disorder, and believed he was

---

[2] Inexplicably, given Dr. Triplehorn's previous position that he was not qualified to provide the disability form, Dr. Triplehorn completed one.

[3] Global Assessment of Functioning ("GAF") scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.). A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." *Id.*

totally and permanently disabled as of February 3, 2005.  *Id.* at 416.

Dr. Harikian completed a pension questionnaire on June 27, 2005, and indicated Plaintiff was "totally and permanently disabled and prevented from performing duties of his occupation."  AR at 357 (emphasis omitted).  In addition, Dr. Harikian opined Plaintiff was unable to perform "the duties of any occupation for which he may be qualified by reason of training or experience" due to Plaintiff's "constant pain."  *Id.* (emphasis omitted).  According to Dr. Harikian, Plaintiff's disability began October 23, 2000.  *Id.*

On January 8, 2009, Plaintiff underwent a third MRI scan on his back. AR at 713-14.  Dr. Clair Waite determined the MRI showed "[w]orsening degenerative disc disease at L5/S1 but with decreased central disc protrusion."  *Id.* at 714.  In addition, Dr. Waite found the MRI showed "[m]oderate right paracentral disc protrusion at T10/11," mild dengenerative changes at L4/5, and "[b]road-based far left lateral paracentral disc protrusion at L1/2."  *Id.*

**B.     Administrative Hearing Testimony**

     1.     June 9, 2004

Plaintiff testified that he had a high school education and completed some college courses.  AR at 482.  He stated he was injured on July 23, 2000, but he went "back to work for a few weeks here and there," and last worked sometime in September 2000.  *Id.*  Because Plaintiff did not have any income, he reported his wife would "sell some things in a yard sale once in a while" and family members were sending money so they could "scrape by."  *Id.*  He stated he had not applied for public assistance because he "grew up on welfare" and resists it.  *Id.* at 483, 488.

According to Plaintiff, he participated in vocational rehabilitation but "didn't finish the classes [and] failed several."  AR at 483.  He stated he had difficulty with the classes because he was in too much pain to concentrate.  *Id.* at 484.  Plaintiff confirmed that stopped trying to be retrained for other maintenance or refinery work after failing the courses, and "pretty much gave up" finding a job after his "setbacks."  *Id.* at 485.

Plaintiff did not have plans for further medical treatment beyond "controlling the pain with pain pills."  AR at 485-86.  He stated the medicine took "the edge off" but was "not real powerful."  *Id.* at 487.  According to Plaintiff, his doctors found surgery was not an option, and he believed

physical therapy "[c]reated more pain than not doing it." *Id.* at 486.

He reported spending the day reading, watching television "quite a bit" and "laying on [his] back." AR at 484, 488. Plaintiff said his exercise was limited to taking the dog out and checking the mail. *Id.* at 484-85. He estimated he was able to walk "a block and a half," because he walked his dog "to the end of the drive" before he would lie down again. *Id.* at 485. When asked what he believed he could lift, Plaintiff responded "25 pounds is what the doctor says." *Id.* Plaintiff said he did not help with the laundry or other household chores, but would take his wife to the grocery store. *Id.* at 487-88.

Thomas Clark, a vocational expert, appeared at the hearing. AR at 498. Mr. Clark reported he worked with Plaintiff during his vocational retraining and had "[f]airly extensive knowledge" about the case. AR at 489-90. Consequently, the ALJ relieved Mr. Clark from the case. *Id.* at 490.

### 2.     June 8, 2006

Plaintiff testified he suffered from herniated discs, degenerative disc disease, borderline diabetes, and "major depression." AR at 499. He said he last worked for hire out of a union hall, which "generally" sent him to jobs requiring heavy labor such as "[j]ack hammering through solid rock" and "[l]ifting 90 pound skids." *Id.* at 500. Plaintiff believed he would "end up laying on the ground –in agonizing pain" if he were to attempt to do that work again. *Id.* at 503.

Plaintiff's counsel asked him to imagine sitting at a table working with widgets that were "not very heavy." AR at 503-04. Plaintiff testified he would not be able to do so eight hours a day because sitting "in the upright position is what aggravates the bones that are rubbing together in my spine." *Id.* at 504. Even if he were permitted to stand, Plaintiff did not believe he would be able to manage eight hours of work because he would " eventually . . . turn wrong" getting out of bed to go to work, which would "cause immense pain." *Id.* at 504-05. He explained that he could just sleep on his back wrong, wake up, and not be able to get out of bed. *Id.* at 512.

Plaintiff testified he spent the days sitting on his futon in a "half recline" position watching television and reading occasionally. AR at 508. He said his wife prepared food, although he was able to make a "pre-prepared" meal that required him to "[j]ust throw it in the microwave." *Id.* at 509. In addition, he said his wife did all the household chores, including feeding and walking the dog. *Id.* at

509, 516-17.  Although he believed there was a risk that his back would go out when driving, Plaintiff said he did most of the driving when he or his wife needed to go somewhere.  *Id.* at 516.

According to Plaintiff, his physicians told him "not to do any heavy lifting over 30 pounds – and to learn to live with it."  AR at 510.  He said he tried "to avoid lifting anything," but he believed he could lift "[m]aybe 10 pounds at most."  *Id.* at 510-11.  However, Plaintiff did not believe he could carry10 pounds on a regular basis beyond "a day or two."  *Id.* at 512.  In addition, Plaintiff said he tried to avoid tasks that required him to bend over.  *Id.* at 516.

He reported that he had "some level of pain at all times."  AR at 505.  On a scale of one to ten, with ten being the worst, Plaintiff said his pain was "probably at a five."  *Id.*  He explained most of the pain was in his back and it "radiate[d] out from there" into his legs.  *Id.* at 507. Plaintiff testified he was no longer taking pain medicine, stating: "I quit taking medications when I found out they kill you."  *Id.* at 513.  He explained he had a prescription for Vioxx, but the medicine was recalled.  *Id.*  In addition, he stopped taking Celebrex.  *Id.*  Plaintiff said he would "just live with the pain" and had "pretty much given up on doctors."  *Id.*  He stated he had not seen a doctor for his back condition or taken medication in a year.  *Id.* at 517, 528.

In addition, Plaintiff reported he had depression that would cause him get in a "funk" and to cry himself to sleep.  AR at 514-15.  He said the periods of depression would last "a day or two," and then his wife would do something to help snap him out of it.  *Id.* at 515.  He explained that when depressed, he would "[s]tay on the couch" and be "in an unpleasant mood."  *Id.*

Vocational expert ("VE") William Weiss testified after Plaintiff at the hearing.  AR at 518.  The VE characterized Plaintiff's past relevant work as a construction worker, which was described by the *Dictionary of Occupational Titles*[4] as heavy, semi-skilled work.  *Id.* at 519.  As Plaintiff performed the work with a jackhammer, it was "very heavy."  *Id.*  In addition, the VE characterized Plaintiff's work as a gas station attendant in 1987 as medium, semi-skilled work.  *Id.* at 519-20.

---

[4] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

The ALJ asked the VE to consider a hypothetical individual "40 years of age and younger" with a high school education.  AR at 520.  The ALJ stated the worker was capable of lifting a maximum of 20 pounds frequently and 10 pounds occasionally, standing and/or walking with the usual breaks in a normal workday for a total of about six hours," and "sitting with normal breaks for a total of about six hours in an eight hour workday." *Id.*  In addition, the individual could frequently balance, clip ramps or stairs, kneel, and crawl, but was limited to occasional stooping and climbing ladders or scaffolds.  *Id.*  The only environmental limitation was "to avoid concentrated exposure to vibration, like operating a forklift." *Id.*  The VE opined such an individual would be able to perform "some light duty jobs." *Id.*  As examples, the VE identified the positions of cashier II (*DOT* 211.462-010) and assembler (*DOT* 706.684-022). *Id.* at 521.  Further, the VE determined such a person could perform sedentary, unskilled work, such as telephone operator (*DOT* 237.267-014) and charge account clerk (*DOT* 205.267-014). *Id.* at 521-22.

Next, Plaintiff's counsel asked the VE to consider an individual who was restricted to "sitting four hours total in an eight hour workday;" walking "15 minutes at a time for a total not to exceed two hours in an eight hour workday;" and standing no more than half an hour, for two hours total.  AR at 522.  The individual was limited to lifting 25 pounds, and was prohibited from "repetitive grasping, pushing, pulling and fine manipulation." *Id.*  Also, the person was unable to bend or climb, could occasionally squat or reach, and required "extended breaks." *Id.*  Further, "the hypothetical claimant's medication might cause sedation." *Id.*  The VE opined that if the individual would be required to leave the work site, he would not be able to perform the jobs identified. *Id.* at 524.

Third, the VE considered a hypothetical worker who was limited to lifting ten pounds occasionally and five pounds frequently, standing and walking a maximum of four hours, and sitting a maximum of four hours.  AR at 524.  The individual was prohibited from pushing, pulling, stooping, or crouching, and had manipulative limitations to "gross movements only." *Id.*  In addition, the worker could not be exposed to vibrations. *Id.*  The VE determined such a person could perform sedentary, unskilled work such as telephone operator and charge account clerk. *Id.* at 525.

As a final question, Plaintiff's counsel asked the VE to consider an individual, with any of the above functional or postural limitations, who became "so racked with pain that he cannot function at

all" and "could neither get to work [n]or once at work could not function until the pain relent for periods of a day or even hours." AR at 526.  The VE opined there would not be any jobs available to such a person.  *Id.* at 527.

### 3.      November 14, 2007

Plaintiff testified the only training he received was when he attempted vocational rehabilitation to be a pipeline technician.  AR at 629.  He explained the math calculations were difficult, and he failed some courses.  *Id.* at 629-30.

Plaintiff described his past work as a journeyman for the Laborers Union, and reported he did "a lot of shoveling," built scaffolds, poured concrete, and performed pipeline maintenance.  AR at 631-33.  He stated he attempted "[l]ight duty" work after his initial injury, but "got hurt again . . . carrying a piece of plywood." *Id.* at 645.  He explained the piece was eight-by-four, and there was another worker carrying the wood, but he hit some ice on the ground which caused him to fall.  *Id.* at 645-46.  As a result, Plaintiff said he did not work after October 2000.  *Id.* at 646.

Plaintiff said his "biggest job" during the day was "to check the mail."  AR at 635. He reported "strenuous activity" could cause his back pain to flare up.  *Id.* at 638.  Plaintiff stated he spent the day sitting on the couch watching television while his wife did housework. *Id.* at 635.  However, Plaintiff said he helped put dishes away, explaining: "[My wife] yells at me to do that every once in a while." *Id.* at 638. Plaintiff reported he went shopping with his wife and would "[p]ush the cart around."  *Id.* at 635. According to Plaintiff, he was able to help unload light groceries, but his wife would unload "soda pop or whatever is heavy."  *Id.*  He explained that he could lift ten pounds as long as he did not have to bend over, and that his doctors "put a limit . . . of 25 pounds."  *Id.* at 648.

Plaintiff testified he was able to bathe and dress himself, but just needed "to take it slow."  AR at 638.  He stated he did not have difficulty washing or combing his air, or putting on a pullover shirt. *Id.* Plaintiff reported that he was able to drive and would "sometimes . . . go driving around a little bit," such as to a park.  *Id.* at 636.  He said he did not have friends that he visited because "they just trickled away after [he] got hurt."  *Id.* at 641.

He reported he had not received treatment for his "chronic pain" since the last hearing, and he was not taking prescription medication.  AR at 634.  Plaintiff attributed this to not having money.  *Id.*

He said he took two, extra-strength Tylenol "once a week" to relieve throbbing in his back.  *Id.*

Plaintiff testified he saw Dr. Barker for depression and "anger issues."  AR at 639-40.  Plaintiff explained he "was getting really mad" at Dr. Triplehorn, because he saw him for almost two years and "all he was doing was feeding me – more medicine."  *Id.* at 640. Plaintiff asserted that he "blew off steam in therapy" and his therapist disclosed the comments to Dr. Triplehorn, who told Plaintiff he could not return for treatment.  *Id.* at 641.  Plaintiff stated Dr. Baker prescribed Cymbalta, which he took "until the pills ran out."  *Id.* at 639.  Plaintiff did not believe the medicine helped, but his anger issues were resolved because he no longer received treatment from Dr. Triplehorn.  *Id.* at 639-40.

VE Daniel LaBrosse testified after Plaintiff at the hearing.  The VE reported Plaintiff's past relevant work prior was "a combination of construction worker I and II."  AR at 652.  He explained Plaintiff's work prior to becoming a journeyman was classified as a construction worker II (*DOT* 869.687-026), and was "very heavy work."  *Id.*  After becoming a journeyman, Plaintiff's work was classified as a construction worker I (*DOT* 869.664-014), which was also "heavy-duty work."  *Id.*

The ALJ asked the VE to consider a hypothetical individual "between the ages of 35 and 45" who had "a high school education with some college."  AR at 652.  The person was "able to lift and carry 20 [lbs] occasionally, 10 lbs frequently," and had "no standing, walking or sitting restrictions."  *Id.*  Further, the individual could not climb or crawl, but was "able to occasionally stoop, crouch, knee, use stairs or ramps, [and] balance."  *Id.*  The VE opined such an individual would be unable to perform Plaintiff's past relevant work.  *Id.*  However, the VE believed such a worker would be able to perform work in the national economy, including "light duty occupation[s]" such as cashier II (*DOT* 211.462-010), retail sales in general merchandising (*DOT* 279.357-054), and agriculture produce sorter (*DOT* 529.687-186).  *Id.* at 653.

Next, the ALJ added mental limitations to the hypothetical, and asked the VE to consider an individual limited to "frequent[] interaction with coworkers, the general public or with supervisors."  AR at 654.  In addition, the worker was "able to understand, remember and carry out simple and detailed, but not complex instruction and tasks."  *Id.*  Given these limitations, the VE opined the positions of cashier and retail sales "would be affected," because the interaction with people "may be constant."  *Id.*  However, the VE identified other light-duty occupations the worker could perform,

1    including cleaner/housekeeper (*DOT* 323.687-014) and small parts assembler (*DOT* 706.685-022).  *Id.*

2    at 654-55.  Further, the VE found the worker could perform sedentary positions such as regular data

3    entry clerk (*DOT* 203.582-054) and surveillance system monitor (*DOT* 379.367-010).  *Id.* at 655.

4            4.      March 15, 2010

5            Plaintiff testified he had an MRI in January 2009 to check his on back because he felt more

6    pain.  AR at 722.  He stated this was the first time he went to a doctor after he "was kicked out" of

7    Tanana Valley in 2004.  *Id.* at 722-23.  Plaintiff reported he took Advil each day, although it was

8    "[n]ot really" helping.  *Id.* 723.  He stated Dr. Witham recommended "conservative management,"

9    which Plaintiff understood meant "don't use your back very much."  *Id.* at 725.

10           Plaintiff reported he did not believe physicians were able to help him, so he stopped seeking

11   treatment.  *Id.* at 724-25.  In addition, he explained he would not go to the doctor because he could not

12   afford for his wife to see a doctor, and she needed to see one as well. *Id.* at 730.  Plaintiff said, "I can't

13   justify myself running out and going to see a doctor whenever I feel like it."  *Id.* at 730.  Although he

14   sought treatment from a community health center that took his income into consideration and adjusted

15   the treatment costs, Plaintiff said he "quit" because "[n]othing happens" and he believed he would not

16   be able to afford treatment.  *Id.* at 731-32.

17           He believed he was able to walk "[a] block and a half" before he started getting pain at the

18   base of his back or shooting down his legs.  AR at 726.  Plaintiff reported he had difficulty sitting, and

19   that sitting in the chair at the hearing caused pain.  *Id.*  He estimated he could sit for an "hour or two"

20   before he needed to move to a reclined position.  *Id.* at 727.

21           According to Plaintiff, he stayed in a recliner "most of the time" watching television.  *Id.* He

22   said he went out "very little," and generally only to get groceries in town where he would "use the cart

23   as a walker."  *Id.* at 727.  In addition, he visited with a friend "three times a week."  *Id.* at 729.

24           Due to the remand order, the ALJ requested clarification of Plaintiff's alleged disability onset

25   date.  AR at 735.  Plaintiff's counsel asserted the date should be "when he stopped working."  *Id.*

26   **C.   The ALJ's Findings**

27           Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

28   gainful activity after the alleged onset date of October 15, 2000.  AR at 665.  Second, the ALJ found

Plaintiff had the following severe impairments: lumbar degenerative disc disease, thoracic degenerative disc disease, and depression. *Id.* These impairments did not meet or medically equal a Listing, including Listings 1.04 and 12.04. *Id.* at 666. Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except he is limited to occasionally climbing of ramps and stairs; he is limited to occasional stooping, crouching, kneeling, balancing; he is limited to no climbing of ladders[,] ropes, or scaffolds; and he is limited to frequent interaction with coworkers, supervisors, and the general public.

*Id.* at 668. With this residual functional capacity ("RFC"), Plaintiff was unable to perform his past relevant work as a laborer. *Id.* at 674. However, the ALJ determined "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." *Id.* at 675. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.*

## DISCUSSION AND ANALYSIS

**A.     The ALJ set forth specific, legitimate reasons to assign less weight to Dr. Triplehorn's opinion.**

In this circuit, courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight, but is not binding on an ALJ. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2). Thus, courts apply a hierarchy to the weight afforded to the opinions of physicians.

The opinion of a treating physician may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751. An ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

17

1    Plaintiff argues the ALJ failed to set forth sufficient reasons for rejecting the opinion of his

2 treating physician, Dr. Triplehorn.  (Doc. 21-1 at 19-22).  Here, the ALJ explained she gave "little

3 weight" to the opinions of Dr. Triplehorn because the opinions were "inconsistent with his own exam

4 findings and the record as a whole."  AR at 673.  This constitutes a specific, legitimate reason for

5 giving less weight to the opinion of a treating physician such as Dr. Triplehorn.

6    The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ

7 finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ

8 explains why the opinion "did not mesh with [his] objective data or history."  *Tommasetti v. Astrue*,

9 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Morgan v. Commissioner of the SSA*, 169 F.3d 595, 603

10 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the decision to

11 discount the opinion of a physician); *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ

12 permissibly rejected treating physician's opinion containing contradictory observations).

13    The ALJ observed Dr. Triplehorn believed he was not "qualified to document that [Plaintiff]

14 was significantly disabled—and stated on several occasions that he would not complete a disability

15 form—but, without explanation, later opined Plaintiff was "functionally disabled."  AR at 673.  In

16 addition, the ALJ noted: "Dr. Triplehorn referenced a 2003 MRI as a basis for his September 2004

17 opinion.  However, the MRI showed only moderate disc herniation and some disc degeneration at

18 multiple lower dorsal levels and at the L4-5 [level]."  *Id.*  Accordingly, the ALJ properly identified

19 inconsistencies with the opinion of Dr. Triplehorn and his records.

20    Further, an ALJ may reject a medical opinion when it is "unsupported by the record as a

21 whole."  *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003).  As noted by

22 the ALJ, Dr. Triplehorn concluded Plaintiff was unable to work, yet physicians such as Drs. Harikian,

23 Joosse, Pierson, and Backlund believed Plaintiff was capable of light work with postural limitations.

24 AR at 671-74.  The ALJ observed Dr. Harikian found Plaintiff "could lift up to 20 pounds

25 occasionally with postural limitations of occasional squatting and no bending."  *Id.* at 671 (citing AR

26 at 364).  Similarly, Dr. Joosse found Plaintiff "should avoid bending and twisting and spine and lifting

27 more than 25 to 30 pounds at a time," and recommended Plaintiff "seek light duty, sedentary-type

28 employment rather than continue heavy lifting."  *Id.* at 672; *see also* AR at 271-73.  The ALJ noted

that Dr. Pierson affirmed this opinion, and recommended Plaintiff "consider applying for vocational rehabilitation in an effort to return to the work force." *Id.* (citing AR at 279-80).  Likewise, Dr. Backlund affirmed the assessment that Plaintiff could perform light work with postural limitations. *Id.* at 674.  Accordingly, the ALJ identified evidence that Dr. Triplehorn's assessment was not supported by the record.

**B.    Plaintiff fails to establish his impairments meet or medically equal Listing 1.04A.**

The Listings set forth by the Commissioner "define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citation omitted, emphasis in original).  At step three of the sequential evaluation, the claimant bears the burden of demonstrating that her impairments equal a Listing.  *Bowen v. Yuckert*, 482 U.S. 137, 141, 146 n. 5 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d).  "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Id.* at 141; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  The ALJ determined Plaintiff's impairments did not "meet[] or medically equal" Listings 1.04 and 12.04.  AR at 666-67.  Plaintiff argues the "2003 MRI documenting a herniated disc at L5-S1 which touches the right S-1 nerve root (Tr. 335), coupled with Dr. Triplehorn's findings on examination are so significant that they appear to document that [Plaintiff's] back impairment may well meet, or at least equals, Listing 1.04A, pertaining to Disorders of the Spine."  (Doc. 21-1 at 22).

Listing 1.04 governs of musculoskeletal impairments and requires a claimant to show a disorder of the spine such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc diseas, facet arthritis, vertebral fracture[], resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04.  To satisfy paragraph "A" of the Listing, there must be:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Id.*  The Supreme Court explained, "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those

criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. at 530 (emphasis in original). Therefore, to meet his burden at step three, Plaintiff must demonstrate he meets the above requirements. In the alternative, Plaintiff may show his condition "equals" Listing 1.04A with "symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of [the] relevant listed impairment." *Tackett*, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526).

As Plaintiff notes, the MRI from 2003 demonstrates he suffered a herniated disc, and the MRI from 2009 shows worsening degenerative changes. (Doc. 21-1 at 14, 22). However, these findings alone are not sufficient to demonstrate he satisfies Listing 1.04A, as he asserts. To the contrary, evidence cited by the ALJ shows Plaintiff did not have the requisite sensory or reflex loss. *See* AR at 666, 669. Specifically, the ALJ noted a "[s]ensory examination of the lower extremities showed intact sensation to light touch at all levels." *Id.* at 666 (quoting AR at 283).

Further, Plaintiff does not identify medical evidence that demonstrates he meets or medically equals the requirement that he have "positive straight-leg raising test (sitting and supine)." *See* 20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.04A. On the other hand, the ALJ identified several physicians who performed a straight-leg test with negative test results. For example, the ALJ noted Dr. Pierson performed the test and found the "straight leg raising test was negative, and [Plaintiff] had no numbness in either lower extremity." AR at 669 (citing AR at 280). When Dr. Pierson performed the test again in April 2001, he again found the results were negative. *Id.* (citing AR at 279). Further, in August 2002, Dr. Jensen determined: "Straight leg raising in the sitting and recumbent position produced no radicular pain and only minimal back pain." *Id.* (citing AR at 309). Similarly, the ALJ observed that treatment notes from Dr. Witham dated October 2003 indicated that "straight leg testing was negative for radicular pain in the sitting position." *Id.* (citing AR at 337).

Consequently, Plaintiff has not carried his burden to establish that his impairments meet or medically equal Listing 1.04A, and Plaintiff has not demonstrated the ALJ erred at step three of the sequential evaluation.

**C.    Substantial evidence supports the ALJ's RFC determination.**

Although Plaintiff argues the ALJ's findings were "based on a selective reading of the record" (Doc. 21-1 at 21), the RFC set forth by the ALJ is supported by substantial evidence in the record. In

20

a Social Security Ruling, the Commissioner explained the term "substantial evidence" "describes a quality of evidence . . . intended to indicate that the evidence that is inconsistent with the opinion *need not* prove by a preponderance that the opinion is wrong."  1996 SSR 4 LEXIS 9 at *8.[5]  Rather, "[i]t need only be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion expressed in the medical opinion."  *Id.*

### 1. Opinion of Dr. Joosse

The opinion of an examining physician may be substantial evidence in support of the ALJ's decision when the opinion is based upon independent clinical findings.  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).   Here, the ALJ gave "significant weight" to the opinion of Dr. Joosse, an examining physician.  AR at 672.  Dr. Joosse noted Plaintiff was able to heel-walk, toe walk, and do a full squat.  *Id.* at 271.  In addition, Dr. Joosse reviewed the medical record, including the MRI from 2003, and determined he would advise Plaintiff "to seek light duty, sedentary-type employment rather than continue heavy lifting."  *Id.* at 272.   He believed Plaintiff should avoid "lifting more than 25 to 30 pounds at a time."  *Id.*

Plaintiff argues this demonstrates Dr. Joosse "was of the opinion that Mr. Shaw could perform sedentary work; not light work as the ALJ found."  (Doc. 21-1 at 17).  The Regulations explain that "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools."  20 C.F.R. §§ 404.1567(b), 416.967(b).  On the other hand, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 461.967(b).   Therefore, the lifting limitations set forth by Dr. Joosse are consistent with the definition of light work, and his opinion is substantial evidence in support of the conclusion that Plaintiff could perform light work.[6]

### 2. Opinion of Dr. Backlund

---

[5] Social Security Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

[6] Significantly, Plaintiff's treating physician Dr. Pierson noted that he concurred with the assessment of Dr. Joosse, noting Plaintiff had "minimal low back symptoms."  AR at 278.  Consequently, Dr. Pierson's opinion also supports the finding that Plaintiff can perform light work.

The opinions of non-examining physicians "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995); *Tonapetyan*, 242 F.3d at 1149 ("[a]lthough the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record").  Similar to Drs. Joosse and Dr. Pierson, Dr. Backlund determined Plaintiff had the ability to perform light work, with certain postural limitations.  AR at 312, 320.  Because the opinion was consistent with their opinions, it is substantial evidence in support of the RFC articulated by the ALJ, and the decision to give less weight to Dr. Triplehorn's opinion.
///

### 3.	Other medical opinions of record

Plaintiff asserts the opinions of Dr. Harikian and Dr. Jensen are not "consistent with" the finding that he can perform the exertional demands of light work.  (Doc. 21-2 at 19).  As noted by the ALJ, Dr. Harikian opined "the day after [Plaintiff's] initial back injury, that he could lift up to 20 pounds occasionally with postural limitations of occasional squatting and no bending."  AR at 671.  The ALJ gave "some weight" to this opinion, and "less weight to Dr. Harikian's later opinions."  *Id.*  In addition, the ALJ observed Dr. Jenson determined Plaintiff "was capable of lifting and carrying up to 25 pounds."  *Id.* at 672.  The ALJ noted Dr. Jensen opined Plaintiff "was capable of light to moderate levels of work with the ability to frequently change positions," but the ALJ did "not accept the change of position limitation because it [was] not consistent with exam findings."  *Id.*

Although Plaintiff implies the ALJ erred evaluating the above opinions, Plaintiff fails to articulate how the ALJ erred in rejecting portions of the assessments offered by Drs. Harikian and Jensen or assessing the weight given to the opinions.  The Ninth Circuit "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant.'"  *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)).  Rather, the Court will "review only issues with are argued specifically and distinctly."  *Id.*  Therefore, when a claim of error is not argued and explained, the argument is waived. *See, id.* at 929-30 (holding a party's argument was waived because the party made only a "bold assertion" of error,

1    with "little if any analysis to assist the court in evaluating its legal challenge"); *see also Carmickle v.*

2    *Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1161, n.2 (9th Cir. 2008) (issue not argued with

3    specificity in the briefing will not be addressed)).  Because Plaintiff failed to identify or discuss any

4    alleged error in the ALJ's reasoning for rejecting portions of the opinions of Drs. Jensen and Harikian,

5    this argument is waived.  Accordingly, the opinions support the ALJ's determination that Plaintiff was

6    able to perform the exertional requirements of light work.

7           4.      The ALJ's reliance upon the findings of single decision makers was a harmless error.

8           Plaintiff argues the ALJ erred in giving weight to the assessments single decision makers, who

9    were non-examining, non-medical agency employees.  (Doc. 21-1 at 16-17).  Plaintiff contends the

10   agency policy set forth in the Program Operations Manual System (POMS) DI 24510.050 provides

11   that residual functional capacity assessments completed by single decision makers "are not opinion

12   evidence." *Id.* at 16.  Defendant concedes that this is true.  (Doc. 26 at 12).  However, Defendant

13   argues the Court cannot reverse on this basis because the Ninth Circuit determined POMS "does not

14   impose judicially enforceable duties on either [the] court or the ALJ." (*Id.* at 13) (quoting *Carillo-*

15   *Yeras*, 671 F.3d 731, 735 (9th Cir. 2001)).  Further, the Ninth Circuit has declined to review

16   allegations that an ALJ failed to comply with an internal agency manual because such a manual "does

17   not carry the force and effect of law." *Moore v. Apfel*, 216 F.3d 864, 868-69 (9th Cir. 2000).

18          Nevertheless, the Court has not considered the opinions of the single decision makers in its

19   evaluation, and the ALJ's RFC determination remains supported by substantial evidence, including the

20   opinions of several physicians.  Accordingly, any error by the ALJ in relying upon the opinions of

21   single decision makers was harmless. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055

22   (9th Cir. 2006) (recognizing application of harmless error where a mistake does not affect the ALJ's

23   ultimate disability conclusion).

24   **D.     The ALJ's credibility determination is supported by clear and convincing evidence.**

25          In determining credibility, an ALJ must determine first whether objective medical evidence

26   shows an underlying impairment "which could reasonably be expected to produce the pain or other

27   symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell*

28   *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Here, the ALJ determined Plaintiff's "medically

determinable impairments could reasonably be expected to cause some of the alleged symptoms."  AR at 668.  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not credible . . ." *Id.* at 669.  Plaintiff asserts the ALJ failed to apply the proper legal standards when evaluating his subjective complaints.  (Doc. 21-1 at 23-25).

An adverse finding of credibility must be based on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ may not discredit a claimant's testimony as to the severity of symptoms only because it is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48.  In addition, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834.

Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  Here, the ALJ considered the conservative treatment received by Plaintiff and its success, objective medical evidence, and Plaintiff's financial strain.  AR at 668-71.

### 1.    Conservative treatment

In assessing Plaintiff's credibility about his symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication."  20 C.F.R. § 404.1529(c).  Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).  The Ninth Circuit has "indicated that evidence of

24

'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007).

Here, the ALJ noted the treatment implemented by physicians was "conservative in nature." AR at 699.  As noted by the ALJ, in April 2001, "Dr. Pierson recommended conservative treatment and . . . advised vocational rehabilitation/job training." *Id.* (citing AR at 279).  The ALJ determined: "Although the claimant continued to receive treatment for the allegedly disabling back pain, that treatment was only conservative in nature.  In addition, the treatment notes show that the claimant's symptoms improved." *Id.* (citing AR at 278).   In 2003, Dr. Witham "recommended ongoing conservative treatment." *Id.* (citing AR at 334).  Further, the ALJ observed: "Dr. Triplehorn noted that the claimant's pain was well controlled with Tramadol." *Id.* (citing AR at 378).  Notably, when an impairment "can be controlled effectively with medication," it cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).  Consequently, the conservative treatments given to Plaintiff support the ALJ's credibility determination.

2.      Objective medical evidence

As a general rule, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999).  The Ninth Circuit stated, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barchart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); SSR 96-7p, 1996 SSR LEXIS 4, at *2-3 (statements "may not be disregarded solely because they are not substantiated by objective medical evidence").  Here, the ALJ's credibility determination did not rest solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff.  However, the objective medical evidence was a relevant factor in evaluating Plaintiff's credibility.

In citing to the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a general statement that the testimony is contradicted by the record.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  Rather, the ALJ "must state which pain testimony is not credible and what evidence suggests the claimants are not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

First, the ALJ reviewed the records related to Plaintiff's back pain and noted the "examination findings are generally moderate to mild and inconsistent with disability."  AR at 669.  Specifically, the ALJ noted Plaintiff declined an epidural injection in December 2000, and "moved easily about the office" at examinations in January and July of 2001.  AR at 669.  Likewise, he "ambulated throughout the exam room without any obvious difficulty" in August 2002.  *Id.*  The ALJ noted Dr. Witham found Plaintiff's "straight leg raising test was negative for radicular pain in the sitting position."  *Id.* (citing AR at 337).  At an exam in August 2004, the test "caused increased pulling in the low back but no increase in radicular symptoms."  *Id.* (citing AR at 378).  Further, the ALJ determined the MRI from January 2009 "showed some worsening but not to the degree of disability alleged."  *Id.* at 670.

Although Plaintiff asserted he suffered from a mental impairment, the ALJ determined his "mental exam findings are generally mild or normal."  AR at 670.  The ALJ reviewed mental health treatment notes dated February- March 2005, which indicated Plaintiff "had a logical and well-connected thought process" and "[h]is memory was intact for recent, remote, and recall events."  *Id.*  Further ALJ observed: "[Plaintiff] easily capable of abstract proverb interpretation as well as concrete judgment in practical scenarios.  He was able to spell the world 'world' backward and forward without difficulty."  *Id.* (citing AR at 412).

The ALJ carried her burden to "identify the testimony she … finds not to be credible and [to] explain what evidence undermines the testimony identify."  *See Holohan*, 246 F.3d at 1208.  Thus, the objective medical evidence supports the adverse credibility determination.

### 3.      Financial motivation

The ALJ observed, "[T]he claimant's reported financial strain and seemingly desperate behavior for disability benefits undercuts his credibility with regard to the severity of his symptoms." AR at 670.  The ALJ explained:

> In March 2004, Dr. Triplehorn noted that the claimant was angry that no one would sign that he was 100 percent disabled from his back injury.  He noted that the claimant previously reported that he could go to California and see a physician who would sign his form and that there were physicians in town who would sign his disability form for $5,000 [citation]. In February 2005, the claimant reported that he received two years initial worker's compensation benefits and then requested withdrawal of his pension early so he could move to California.  He was repeatedly denied and grew increasingly angry [citation]. The claimant reported he had no income coming in and was selling toys he bought when he was working.  He reported that he was running out of things to sell [citation]. Ms. Nevin-Haas noted that the claimant was banned from Tanana Valley Clinic premises due to statements he made about wanting to shoot Dr. Triplehorn for not signing his pension release form [citation].  In response to a question regarding his goals the claimant responded, "To get my pension and get out of here [citation].

*Id.* at 670-71.

As noted by one district court, financial motivation may not be a valid reason for discrediting subjective complaints.  *See Ratto v. Sec'y, Dept. of Health & Human Servs.*, 839 F.Supp. 1415, 1428-29 (D. Or. 1993) ("If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible").  However, an ALJ is not required to ignore evidence that suggests a claimant is motivated by financial reasons independent of a legitimate claim of disability benefits.  *See, e.g., Tommasetti v. Astrue*, 533 F.3d at 1040 (ALJ inferred the claimant may not have been motivated to work due to a financial reserve); *Rameriz v. Barnhart*, 292 F.3d 576, 581 n.4 (8th Cir. 2002) ("an ALJ may consider a claimant's financial motivation to qualify for benefits while assessing the credibility of a claimant's subjective complaints," but this factor should not be dispositive); *Frost v. Astrue*, 2012 U.S. Dist. LEXIS 117215, at *27 (W.D. Wash., Aug. 1, 2012) (it was proper for an ALJ to "point out … [a claimant's] motivation for seeking disability benefits appears to have been solely economic hardship, and not economic hardship based on disability").  Here, the ALJ inferred from the evidence that Plaintiff was motivated by his financial situation to obtain benefits.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1999) (an ALJ "is entitled to draw inferences logically flowing from the

evidence").  Consequently, Plaintiff's financial motivation was a valid consideration by the ALJ, and supports the adverse credibility determination.

The ALJ set forth clear and convincing reasons to reject Plaintiff's credibility.  Further, the ALJ satisfied the burden to make "a credibility determination with findings sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

## CONCLUSION AND ORDER

Although Plaintiff identifies evidence that he asserts support his subjective complaints and a finding that he is disabled, the decision of the ALJ is supported by substantial evidence in the record. The ALJ set forth specific, legitimate reasons for giving less weight to the opinion of Plaintiff's treating physician, Dr. Triplehorn, and substantial evidence in the record—including the opinions of several physicians— supports the RFC that Plaintiff is able to perform the exertional requirements of light work.  Also, Plaintiff failed to demonstrate his impairments meet or medically equal Listing 1.04A.  Finally, the ALJ set forth clear and convincing reasons to reject Plaintiff's credibility.

The Ninth Circuit explained, "The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *see also Thomas*, 278 F.3d at 954 ("[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's decision, the ALJ's conclusion must be upheld"). Thus, the ALJ's conclusion that Plaintiff is not disabled must be upheld by the Court.  *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**;

2.      Plaintiff's motion for summary judgment (Doc. 21) is **DENIED**; and

///

///

///

///

28

3.    The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Monte Y. Shaw.

IT IS SO ORDERED.

Dated:   **January 16, 2013**                    **/s/ Jennifer L. Thurston**
                                          UNITED STATES MAGISTRATE JUDGE

29